UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

STATE OF CONNECTICUT                    :

                                        :        ss: Hartford, March 20, 2018

COUNTY OF HARTFORD                      :        3:18mj 507 RAR

2018 MAR 21  P 2: 26

DISTRICT COURT
HARTFORD CT

## AFFIDAVIT

I, Abhilash Pillai, a Special Deputy United States Marshal, having been duly sworn, do

hereby state:

### I.      Training and Background

1. I am a Detective with the Hartford Police Department (HPD) and have been employed as

a Hartford Police Officer for approximately fifteen (15) years. My responsibilities include

investigating and enforcing city and state criminal laws.  I am also currently assigned to the

Federal Bureau of Investigation's Northern Connecticut Violent Crimes Gang Task Force

(hereafter referred to as "NCVCGTF"), which is a Federal Bureau of Investigation (FBI)

sponsored task force consisting of law enforcement agents from the FBI, the HPD, the

Connecticut State Police, and the Connecticut Department of Corrections. The NCVCGTF task

force is dedicated to combating violent crime and firearms and narcotics violations affecting the

Hartford, Connecticut. As a member of the NCVCGTF, I have been duly deputized as a Special

Deputy United States Marshal and FBI Task Force Officer which authorizes me to investigate

violations of federal criminal law.

2. I attended the Hartford Police Academy in Hartford, Connecticut, where I received law

enforcement training, to include firearms training, the execution of search and seizure warrants,

investigative techniques, and legal instruction, which covered Fourth Amendment searches and

seizures. I have written and executed search warrants that have resulted in the seizure of illegal

drugs and evidence of drug violations.  I have executed seizure warrants that have resulted in the

seizure of assets acquired with drug proceeds and assets utilized to facilitate drug activities.

3.   Over the past thirteen years in law enforcement, I have participated in investigations

involving the illegal distribution of controlled substances, firearms and gang related acts of

violence to include homicides, shootings, robberies and home invasions.  I have coordinated

controlled purchases of illegal drugs and firearms utilizing confidential sources and cooperating

witnesses.  I have written and coordinated the execution of search and arrest warrants pertaining

to individuals involved in the distribution of illegal drugs, conducted electronic as well as

physical surveillance of individuals involved in illegal drug distribution, analyzed records

documenting the purchase and sale of illegal drugs, and provided testimony in federal and state

grand jury proceedings.  I have also interviewed admitted drug traffickers, drug users, gang

members, informants and cooperating defendants, as well as local, state and federal law

enforcement officers, regarding the manner in which drug distributors obtain, finance, store,

manufacture, transport, and distribute their illegal drugs.  I have supervised the activities of

informants and cooperating witnesses who have provided information and assistance in the

federal prosecution of drug offenders.

4.   During my tenure as a law enforcement officer, I have investigated and participated in

numerous operations which involved drug trafficking offenses, tracking the flow of the illegal

proceeds obtained from drug trafficking, and related offenses such as violations of firearms laws.

My involvement in these investigations has resulted in the successful prosecution of numerous

individuals and the forfeiture of assets purchased with the proceeds from unlawful drug

trafficking, as well as assets used to facilitate these violations.  Search warrants relating to these

investigations have covered vehicles, businesses and residences of drug traffickers and their co-

conspirators.  In addition, these search warrants have also covered "stash houses" used as storage and distribution points for controlled substances and United States currency used by drug dealers for their unlawful drug trafficking activities.

5.   Materials searched for and recovered in these locations have included various controlled substances, drug paraphernalia, books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs, records reflecting the names, addresses, and telephone numbers of co-conspirators, sales receipts and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution, currency and money wrappers, records of bank transactions made to conceal and launder drug trafficking proceeds, cellular telephones, paging devices, computers and computer disks, answering machines, and various valuable assets such as real property and automobiles that were purchased with the proceeds of unlawful drug trafficking.  These items obtained during the execution of said search warrants have constituted evidence of drug violations, the acquisitions of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

6.   Based on my training, experience and participation in this and narcotics trafficking investigations, I know that:

a.   traffickers often use wireless telephones;

b.   traffickers often speak to one and other using coded, cryptic or slang words and phrases, in the belief that by doing so they can thwart the efforts of law enforcement to identify them, identify their criminal activities, and seize contraband and/or criminal assets;

c.   traffickers often communicate information pertaining to their criminal activities by electronic communications, such as SMS, or texting.

d.  during debriefings of defendants and other sources, I have learned that traffickers utilize text messaging and other electronic media to thwart law enforcement detection;

e.  traffickers often place assets, such as wireless phones, in the names other than their own or utilize pre-paid wireless telephones that require the purchaser to provide little or no identifying information to purchase, activate and utilize the phone, all of which is done in an effort to avoid detection and thwart the efforts of law enforcement;

f.  traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

g.  even though these assets are placed in the names of other persons or entities, the traffickers actually own and continue to use these assets and exercise dominion and control over them;

h.  traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug business; these materials, as well as records, generally described below, are often kept and maintained within premises controlled or used by the traffickers within safes or lock boxes;

i.  traffickers maintain in their possession computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashier's checks, money orders, telephones with memory capabilities, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances or firearms that have been distributed; these materials are often maintained within the electronic memory of personal computers, i-Pads, i-Phones or other computerized wireless telephones, tablets, external

hard drives, memory cards and "thumb drives" kept and maintained at premises under the control of the traffickers;

j.   traffickers commonly provide narcotics on consignment sale to their customers, who subsequently pay for the drugs after reselling the drugs.  Therefore, the above mentioned books, computerized records, records, receipts, notes, ledgers, et cetera, will be secured by the traffickers within their control for their ready access to them for the purpose of determining debts and collecting monies derived from illegal activities;

k.   traffickers commonly conceal contraband, proceeds of criminal transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone and beeper numbers of criminal associates within their residences, for ready access and to conceal them from law enforcement agencies;

l.   traffickers commonly maintain records reflecting names, nicknames, addresses, and telephone numbers of both their current and past criminal associates in hard copy and also on electronic devices, such as their cellular telephones, tablets, and other computing and electronic communication devices;

m.   traffickers who are aware of an ongoing criminal investigation will often destroy an existing format of records reflecting their criminal transactions.  However, it is common for traffickers, particularly traffickers who provide or receive drugs on a consignment basis, to create another type of record to assist the trafficker in the collection of drug debts;

n.   traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets; these items

are also commonly stored in the memory or electronic devices found within their homes, such as cellular telephones, tablets, laptops, and other electronic communication and computing devices;

o.   traffickers will commonly conceal within their residences or within the curtilage of their residences, currency, firearms, financial instruments, jewelry, electronic equipment and other items of value and proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from trafficking;

p.   traffickers will attempt to legitimize the profits from illegal transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

q.   persons involved in trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

r.   traffickers often have photographs, slides, or video movies of themselves, their co-conspirators and the property and assets purchased with illegal proceeds.  These photographs and video movies are normally in the traffickers' possession or residence or are frequently stored electronically on wireless telephones, i-Pads, computers, and other electronic devices;

s.   traffickers commonly have firearms and other weapons in their possession, in their cars, on their person, at their residence including, but not limited to handguns, rifles, shotguns, automatic weapons, and knives.  These firearms and weapons are most often kept to protect and secure the traffickers' property;

t.   traffickers often create secret locations, commonly called "traps," in their automobiles. Often, traffickers will use these automobiles to store narcotics, weapons, money and other items and documents related to their illegal trade; and

u.   traffickers often possess, maintain and control other items related to their trafficking activities in their cars, homes, garages and out buildings, and in safes or lock boxes maintained at such locations.

## II. Introduction Concerning the Instant Investigation

7.   I am one of the case agents who have directed the investigation that is the subject of this Affidavit.  I have done so in conjunction with other law enforcement agents and officers.  I am thoroughly familiar with the information contained herein.

8.   This Affidavit is submitted for the limited purpose of establishing probable cause for the issuance of a search and seizure warrant for four (4) wireless telephones (collectively referred to as "The Target Devices").

9.   As this affidavit is being submitted for the limited purpose of obtaining a search warrant for the Target Devices, I had not included all the facts and information obtained during this investigation.  Rather, I have included only those facts which I believe establish probable cause to conduct the requested search.

## III. Description of Property to be Searched

10. As described in Attachment B, the Target Devices are:

a.   one (1) black LG cellphone;

b.   one (1) black Alcatel cellphone;

c.   one (1) black Alcatel one-touch cellphone; and

d.   one (1) white LG cellphone.

11. The Target Devices are presently in the custody of the Hartford Police Department.   As described in more detail below, the Target Devices were originally seized during the execution of a search warrant on or about August 2, 2017.

### IV. The Investigation

12. On or about August 1, 2017, the Hartford Police Vice and Narcotics Unit obtained a state search warrant for 131/133 Huyshope Avenue, Apt. 4A, in Hartford, Connecticut (hereafter referred to as the "Subject Premises"). The search and seizure warrant was obtained as the result of an investigation into narcotic distribution activities by MITCHELL LURRY (DOB xx/xx/1989) and his criminal associates.

13. In connection to the instant investigation and as part of the support for the state search warrant, officers conducted a controlled purchase of heroin from one of MITCHELL LURRY's criminal associates, RAYMOND ORTEGA, on or about July 31, 2017. Prior to the meeting, officers searched the CI[1] for contraband and money with negative results. Officers provided the CI with funds to purchase heroin from ORTEGA. When the CI met with ORTEGA to conduct the controlled buy, ORTEGA told the CI that he had recently sold the last of his heroin, but that he was going to obtain more heroin. ORTEGA told the CI to wait.

14. Officers observed ORTEGA leave a residence on a silver moped motorcycle. Officers simultaneously observed MITCHELL LURRY leave the same residence in a Cadillac. Officers surveilled both men as they traveled to a secondary location. Officers then observed LURRY and ORTEGA engaged in a brief conversation, after which officers observed both men depart the location and travel in opposite directions.

15. Officers followed LURRY to the Subject Premises. Specifically, Officers observed LURRY (in the Cadillac) travel to the parking lot area of 131/133 Huyshope Avenue and pull into a parking spot labeled "4A." Officers observed LURRY exit the Cadillac and approach an

---

1 Information obtained from this CI has been proven to be reliable as s/he has provided information in regards to criminal activity that has led to the arrests and convictions of persons engaged in such activity  The arrests have led to the seizure of illegal drugs and weapons.

entry/exit door which was the only door located on the northeast corner of 131/133 Huyshope Avenue. Officers then observed LURRY opening the door, labeled "4A", with a key.

16. A short time later, officers observed ORTEGA arrive at the Subject Premises and park his moped next to the Cadillac. Officers observed ORTEGA approach the same entry/exit door labeled "4A". Moments later, officers observed LURRY open the door and escort ORTEGA inside. Several minutes later, officers observed ORTEGA exit the same door and depart the area on his moped.

17. Officers followed ORTEGA as he travelled back to meet the CI. Officers observed ORTEGA conduct a hand-to-hand narcotics transaction with the CI. Following the exchange, officers followed the CI to a prearranged location. The CI did not make any stops or meet anyone on the way. At the prearranged location, the CI gave officers twenty (20) white wax sleeves, each sleeve containing a beige powder substance. Officers conducted a field test on a portion of the substance and the test returned a positive reaction for the presence of heroin. Officers searched the CI for contraband or money with negative results.

18. On or about August 2, 2017, officers executed the search warrant at the Subject Premises. At the time officers executed the search warrant, no one was in the residence. The Subject Premises is a one-bedroom apartment with a kitchen, living room, and bathroom.

19. From on top of the kitchen cabinets, officers located a plastic bag containing approximately 201 white wax sleeves each containing a beige powder substance. Officers conducted a field test on a portion of the substance and the test returned a positive reaction for the presence of heroin. Officers also recovered a black Alcatel cellphone, a white LG cellphone, and a black Alcatel one-touch cellphone. Officers recovered a fourth phone, a black LG cellphone, from the kitchen countertop.

20. From within a bedroom closet, officers located a clear plastic bag containing a beige powder substance.  Officers conducted a field test on a portion of the substance and the test returned a positive reaction for the presence of heroin.  This heroin was "uncut," meaning it was not yet packaged for street-level distribution.  Officers recovered pre-inked stamps labeled "skittles" and "oreo" next to the uncut heroin.  Based on my training and experience, the undersigned affiant knows that narcotic traffickers often name or "brand" their packaged narcotics.

21. From within the closet, officers also recovered additional distribution paraphernalia including a box of empty wax sleeves consistent with heroin packaging sleeves, a scale with powder residue, a silver strainer with residue, a toothbrush, and a box of zip lock sandwich bags. Officers also seized two (2) clear plastic bags containing a white chalk-like substance and several small rubber bands from within the closet.  Based on training and experience, officers identified the white chalk-like substance as "cut," a substance used by narcotics traffickers to dilute narcotics for a greater return or profit margin.

22. Officers were unable to identify any proof of residence within the apartment.  Following the search warrant execution, officers were unable to locate MITCHELL LURRY.

**V.  Information Regarding Cellular Telephones and the Target Devices**

23. Based on my training and experience, as well as information asserted herein, there is probable cause to believe, and I do believe, that within the **Target Devices** there will be found items which constitute evidence of the crimes of the unlawful possession, distribution and trafficking of controlled substances and firearms, in violation of Title 18, United States Code, Sections 922(g), and Title 21, United States Code, Sections 841 and 846. Based on my training and experience, there is probable cause to believe and I do believe, that within the **Target Devices** there will be information establishing MITCHELL LURRY's possession of the **Target Devices**

and, by extension, evidence tying him to the contraband seized from the Subject Premises.

24. Based on my training, experience, I also know that the aforementioned **Target Devices** may have some or all of the capabilities that allow each phone to serve as a wireless telephone, digital camera and video recorder, portable media player, global positioning system (GPS) navigation device, a hand-held radio, and a personal digital assistant (PDA). In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the particular device, as well as evidence relating to co-conspirators with whom the device was in contact.

25. With regards to the **Target Devices**, I request permission to seize and search the subject telephone for evidence relating to the unlawful distribution and the possession with intent to distribute, narcotics and/or firearms, including evidence of communications between MITCHELL LURRY and other co-conspirators involved in the distribution of narcotics and/or firearms.

26. Based on my training and experience, and as set forth in this affidavit, I know wireless telephones are used by co-conspirators to communicate efforts to conduct criminal activities and it is likely that the **Target Devices** were used by MITCHELL LURRY to communicate with co-conspirators in the unlawful distribution of narcotics and/or firearms. Furthermore, based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of text communications between co-conspirators who distribute narcotics and/or firearms, or conspire to do so. Also based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of internet searches for locations and addresses used for storing and distributing narcotics and/or firearms. Also based on my training and experience, wireless phones may contain videos and images of co-conspirators, possible locations to ship, receive, or store narcotics and/or firearms, the quantity of narcotics and/or

firearms, as well as shipping packages within which the narcotics are concealed. Specifically, based on my training and experience, I know the following information tends to exist on wireless telephones, including phones used by those involved in the distribution of narcotics and/or firearms:

    a.  the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of said telephone;

    b.  the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

    c.  descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

    d.  any and all records, however created or stored, which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

    e.  any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

    f.  GPS coordinates, waypoints, destinations, addresses, and location search    parameters associated with GPS navigation software;

    g.  saved searches, locations, and route history in the memory of said devices;

    h.  internet browsing history, to include, internet searches in the memory of said device; and

    i.  images and videos in the memory of said device.

27. It is also requested that the Court authorize the retrieval of the above described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device. I am aware that in some cases the software or equipment necessary to analyze wireless telephones in this manner is not readily available to law enforcement during the course of the execution of a search and/or arrest warrant. Further, turning on wireless phones in a non-laboratory setting, where there is no "jammer" active or radio shielding devices, permits additional signals to be received by the phone and thereby alters the data present in the phone at the time of seizure. Therefore, it is

often necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted.

28. It is also requested that warrants be deemed executed once the **Target Devices** have been seized in the manner described above, and that further analysis of the images be permitted at any time thereafter.

29. It is also requested that stored electronic information, data, information and images contained in the **Target Devices** may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.

**VI. Electronic Storage and Forensic Analysis**

30. The warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

31. As described above and in **Attachment A**, the undersigned Affiant seeks permission to search and seize evidence that the **Target Devices** might contain, in whatever form they are stored.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Even when a user deletes information from a device, it can sometimes be recovered with forensics tools.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

32. Searching for the evidence described in **Attachment A** may require a range of data analysis techniques.  In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual

search through unrelated materials that may be commingled with criminal evidence.  In other

cases, however, such techniques may not yield the evidence described in the warrant.  Criminals

can mislabel or hide information, encode communications to avoid using key words, attempt to

delete information to evade detection, or take other steps designed to frustrate law enforcement

searches for information.  These steps may require agents and law enforcement or other analysts

with appropriate expertise to conduct more extensive searches, such as scanning storage areas

unrelated to things described in **Attachment A**, or perusing all stored information briefly to

determine whether it falls within the scope of the warrant.  In light of these difficulties, HPD,

FBI, or other law enforcement agency, intends to use whatever data analysis techniques appear

necessary to locate and retrieve the evidence described in **Attachment A**.

**VII.     Conclusion**

33. I submit that this affidavit supports probable cause for a search warrant to seize the

**Target Devices** described herein and in **Attachment B** and to search the **Target Devices** for the

items described in **Attachment A** for evidence, fruits, and instrumentalities of the crimes of the

unlawful possession, distribution and trafficking of firearms and controlled substances, in

violation of Title 18, United States Code, Sections 922(g), and Title 21, United States Code,

Sections 841 and 846.

Abhilash Pillai
Special Deputy U.S. Marshal and
Task Force Officer of the
Federal Bureau of Investigation

Subscribed and sworn to before me this 20th day of
March, 2018.

/s/ Robert A. Richardson

ROBERT A. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

14

## ATTACHMENT A
## PARTICULAR ITEMS TO BE SEIZED

All records presently on the Target Device 1, Target Device 2, Target Device 3, and Target Device 4 (collectively referred to as the "Target Devices") and all deleted records which are able to be recovered from the Target Devices as they related to violations of Title 18, United States Code, Sections 922(g), and Title 21, United States Code, Sections 841 and 846 by MITCHELL LURRY and his criminal associates, including:

a. the telephone number, ESN number, serial number, and SIM card number;

b. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory;

c. descriptions of time, date, locations, items, or events showing the commission of, or connecting a person to, the above-described crimes;

d. all records, however created or stored, which demonstrate ownership and use of the device;

e. all records providing identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the device;

f. any evidence showing the identity of the maker or user of the data and information contained in the device, such as passwords, sign-on codes, and program design;

g. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

h. saved searches, locations, and route history in the memory of said devices;

i. internet browsing history, to include, internet searches in the memory of said device; and

j. images and videos in the memory of said device;

## **ATTACHMENT B**
## **PROPERTY TO BE SEARCHED**

      The property to be searched, the Target Devices, are presently in the custody of the Hartford Police Department after being seized during the execution of a search warrant on or about August 2, 2017.  As the phones are unopened, further information such as the respective International Mobile Equipment Identify for each phone is unknown at this time. Instead, the Target Devices are identified as:

      a.   one (1) black LG cellphone (Target Device 1);

      b.   one (1) black Alcatel cellphone (Target Device 2);

      c.   one (1) black Alcatel one-touch cellphone (Target Device 3); and

      d.   one (1) white LG cellphone (Target Device 4).

16